[No. B151800. Second Dist., Div. Two. July 10, 2003.]

SHION SAKIYAMA et al., Plaintiffs and Appellants, v.
AMF BOWLING CENTERS, INC., Defendant and Respondent.

HSIN HWA CHEN et al., Plaintiffs and Appellants, v.
AMF BOWLING CENTERS, INC., Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of sections I.C., I.D., and II of the Discussion.

## Counsel

Law Offices of Brian D. Witzer, Brian D. Witzer and Andrew J. Spielberger for Plaintiffs and Appellants Shion Sakiyama, Julie Kuo, Jong Hee Lee and Sun Hee Kwon.

Law Offices of Richard R. Reyes and Richard R. Reyes for Plaintiffs and Appellants Hsin Hwa Chen and Chin Chih Ting.

Shaver, Korff & Castronovo, Tod M. Castronovo and Eve H. Korff for Defendant and Respondent.

OPINION

**ASHMANN-GERST, J.**—This appeal arises out of a tragic incident. Four teenagers attended an all-night party and then attempted to drive home. Unfortunately, the driver of the vehicle crashed into a tree, killing herself and one passenger and severely injuring the two other passengers. The two injured parties (Shion Sakiyama (Sakiyama) and Julie Kuo (Kuo)) and the parents of the two deceased teenagers (Lynn Chen (Chen) and Suel Lee (Lee))[1] brought the instant lawsuit against numerous persons, including AMF Bowling Centers, Inc. (AMF), the owner of the facility where the party was held. Appellants theorize that AMF is liable under traditional negligence theories because AMF had a duty not to allow its facility to be used for an all night rave party, an allegedly inherently dangerous event. We disagree. ■ We hold that the trial court properly granted AMF summary judgment because (1) all-night rave parties are not inherently dangerous, and (2) AMF did not have a duty not to allow its facility to be used for such a party, even if it knew or could assume that drugs would be used by some of the attendees.

Moreover, the trial court properly denied appellants' motion for reconsideration. The motion failed to include new facts and/or new law, and even if some of the facts could be construed as "new," they do not alter the conclusion that AMF did not owe a duty to appellants.

## FACTUAL[2] AND PROCEDURAL BACKGROUND

On March 13–14, 1999, a "rave" party[3] was held at AMF's roller skating rink, World on Wheels. Chen, Lee, Sakiyama, and Kuo, all teenagers, arrived at the event between 10:00 p.m. and 10:30 p.m.

### Drug Use

According to appellants, drugs were being used and sold at the event. In fact, Kuo purchased "ecstasy" about 30 minutes after arriving at World on

---

[1] Hisin Hwa Chen and Chin Chih Ting filed their lawsuit on behalf of Chen; Jong Hee Lee and Sun Hee Kwon filed their lawsuit on behalf of Lee. For the ease of the reader, we refer to Chen, Lee, Sakiyama, and Kuo collectively as appellants. We recognize that it is the parents of Chen and Lee who are the actual parties to the lawsuits.

[2] ■ Because we review a motion for summary judgment de novo, our factual summary is based only upon facts, supported by evidence, contained in AMF's motion for summary judgment and appellants' opposition to said motion. (Code Civ. Proc., § 437c, subd. (c); *Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 612 [76 Cal.Rptr.2d 479, 957 P.2d 1313]; *Arnold v. Dow Chemical Co.* (2001) 91 Cal.App.4th 698, 707 [110 Cal.Rptr.2d 722] ["We must determine whether the facts, as shown by the parties, give rise to a triable issue of material fact."].)

[3] The parties dispute the nature of the party. AMF characterizes the party as a late-night musical event. On the other hand, appellants describe the party as an all-night dance party, at which drugs are openly sold and used by teenagers.

Wheels. She purchased two tabs of the drug, which she divided into halves. Both she and Lee each took half a tab of ecstasy approximately 45 minutes after arriving at the skating rink. Although Kuo did not see Sakiyama take any ecstasy, Sakiyama later told her that she had taken her share of the drugs. Neither Kuo nor Sakiyama know whether Chen ingested any ecstasy while at the party.

Various items (which appellants characterize as drug paraphernalia), including pacifiers, whistles, masks, and glow sticks, were sold at the party. However, AMF and its security personnel took numerous steps to confiscate and remove both drugs and drug paraphernalia from the facility. Specifically, prior to the party, AMF employees were told that because attendees would try to sneak into the event with drugs, they were required to identify any such persons and confiscate the drugs. Before attendees could enter the party, they were searched twice—once outside the facility and once inside the roller skating rink—and any known drug paraphernalia (surgical masks, dust spray, balloons, and Vick's Vapor Rub bottles) was confiscated. During the party, AMF employees confiscated drugs and drug paraphernalia. Moreover, drug dealers were identified and ejected from the premises.

There is no evidence that AMF furnished appellants, or anyone else, with drugs.

### Car Accident

The four girls left the rave party while it was still dark out. After exiting the arena, all four girls sat down for about 30 minutes because they were tired. A security guard then approached them and told them that it was time to leave.

Once in the car, Kuo and Lee fell asleep almost immediately. Chen and Sakiyama discussed whether Chen felt able to drive. Chen told Sakiyama that she "could drive."

According to Sakiyama, they got lost after leaving World on Wheels. It took them between 45 minutes and one hour to find the freeway. They were so tired that they rolled down the car windows and turned the volume on the radio up loud.

Sakiyama fell asleep approximately a half-hour after entering the freeway. Before she fell asleep, Chen seemed to be driving fine.

Over an hour after they left the party and about 30 miles from the roller skating rink, appellants were involved in a single-car accident. Chen struck a tree, causing severe injuries to Kuo and Sakiyama. Both Chen and Lee were killed.

### Procedural History

In March 2000, Sakiyama, Kuo, and the successors in interest of Lee, filed their first amended complaint for personal injuries and wrongful death. In September 2000, Hsin Hwa Chen and Chin Chih Ting, individually and as successors in interest of Chen, filed their complaint for wrongful death. The two separate lawsuits were thereafter consolidated and transferred to one court.

On April 13, 2001, AMF filed its motion for summary judgment, arguing, inter alia, that it did not owe a duty of care to appellants. Appellants opposed the motion, asserting that AMF owed them (and the general public) a duty not to participate in the creation of a rave, which they define as a dangerous event. On May 21, 2001, the trial court granted AMF's motion for summary judgment, adopting AMF's argument that it did not owe a duty to appellants.

Thereafter, appellants filed a motion for reconsideration of the trial court's order. Appellants asserted that they possessed both new facts and new law which warranted reconsideration. AMF filed an opposition, and on June 27, 2001, the trial court denied the motion for reconsideration, reasoning that "there is no new evidence to suggest AMF had a duty to prevent Plaintiff's [*sic*] from acquiring and ingesting the drug Ecstasy and then thereafter not driving a car." After a signed judgment could not be located in the trial court file, judgment was entered nunc pro tunc with a retroactive date of June 12, 2001, in favor of AMF and against appellants.

This timely appeal followed.

### DISCUSSION

### I. *Motion for Summary Judgment*

#### A. *Standard of Review*

"A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) We review the trial court's decision de novo." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116] (*Merrill*); see also *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].) ■ If, in deciding this appeal, we find there is no issue of material fact, we affirm the summary judgment if it is correct on any legal ground applicable to this case, whether that ground was the legal theory adopted by the trial court or not, and whether it was raised by defendant in the trial court or first

addressed on appeal. (*Western Mutual Ins. Co. v. Yamamoto* (1994) 29 Cal.App.4th 1474, 1481 [35 Cal.Rptr.2d 698].) If, on the other hand, we find that one or more triable issues of material fact exist, then we must reverse the judgment.

Exercising our independent judgment as to the legal effect of the undisputed facts (*Spitler v. Children's Institute International* (1992) 11 Cal.App.4th 432, 439 [14 Cal.Rptr.2d 197]) and acknowledging the obligation to affirm on any ground supported by the record (*Becerra v. County of Santa Cruz* (1998) 68 Cal.App.4th 1450, 1457 [81 Cal.Rptr.2d 165]), we find summary judgment properly was granted.

### B. *AMF Did Not Owe Appellants a Duty of Care*

"Actionable negligence is traditionally regarded as involving the following: (a) a *legal duty* to use due care; (b) a *breach* of such legal duty; (c) the breach as the *proximate or legal cause* of the resulting injury. [Citations.]" (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 732, pp. 60–61.) The question here is whether AMF owed appellants a duty of care. "The determination of duty is primarily a question of law. [Citations.] It is the court's 'expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' (Prosser, Law of Torts (4th ed. 1971) pp. 325–326.) Any number of considerations may justify the imposition of duty in particular circumstances, including the guidance of history, our continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall. [Citation.] While the question whether one owes a duty to another must be decided on a case-by-case basis, every case is governed by the rule of general application that all persons are required to use ordinary care to prevent others from being injured as the result of their conduct. [Citation.]" (*Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36], fn. omitted (*Weirum*).)

In *Rowland v. Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561] (*Rowland*), the Supreme Court set forth the now well-known factors courts consider in ascertaining whether a legal duty exists: "[1] the foreseeability of harm to the plaintiff, [2] the degree of certainty that the plaintiff suffered injury, [3] the closeness of the connection between the defendant's conduct and the injury suffered, [4] the moral blame attached to the defendant's conduct, [5] the policy of preventing future harm, [6] the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and [7] the availability, cost, and prevalence of insurance for the risk involved. [Citations.]" (See also *Kentucky Fried Chicken of Cal., Inc. v. Superior Court*

(1997) 14 Cal.4th 814, 820 [59 Cal.Rptr.2d 756, 927 P.2d 1260].) Appellants seem to believe it is a simple matter to plug the facts in this case into the *Rowland* formula and come out with a finding of the existence of a duty of care, particularly if we share their personal assessment and characterization that rave parties are, per se, inherently dangerous. We do not agree. To impose ordinary negligence liability on a business owner that has done nothing more than allow its facility to be used for an all-night party, even if we assume that AMF knew that drugs would be used at the party, would expand the concept of duty far beyond any current models. ■ For the reasons discussed herein, we conclude that a business owner that leases its facility for a one-night event does not owe a duty of care to a person injured hours later at a remote location as a result of voluntary drug use and/or fatigue.

### 1. *Foreseeability*

"[F]oreseeability of the risk is a primary consideration in establishing the element of duty. [Citation.]" (*Weirum, supra,* 15 Cal.3d at p. 46.) ■ It is determined in light of the totality of the circumstances and balanced against the burden to be imposed. (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 677 [25 Cal.Rptr.2d 137, 863 P.2d 207] (*Ann M.*); *White v. Southern Cal. Edison Co.* (1994) 25 Cal.App.4th 442, 447 [30 Cal.Rptr.2d 431].)

■ To support a duty of care, the foreseeability must be reasonable. (*Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 402 [95 Cal.Rptr.2d 786, 97 Cal.Rptr.2d 12] (*Juarez*); *Sturgeon v. Curnutt* (1994) 29 Cal.App.4th 301, 306 [34 Cal.Rptr.2d 498].) The Court of Appeal has articulated the standard as follows: "The reasonableness standard is a test which determines if, in the opinion of a court, the degree of foreseeability is high enough to charge the defendant with the duty to act on it. If injury to another ' "is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct" ' [citations], we must label the injury 'reasonably foreseeable' and go on to balance the other *Rowland* considerations." (*Sturgeon, supra,* at p. 307.) ■ With respect to holding a defendant liable for the behavior of a third party, the same reasonableness standard applies. "In other words, 'a duty to take affirmative action to control the wrongful acts of a third party will be imposed only where such conduct can be reasonably anticipated. [Citations.]' [Citation.]" (*Juarez, supra,* at p. 402; see also *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1189 [91 Cal.Rptr.2d 35, 989 P.2d 121] (*Sharon P.*) disapproved on other grounds in *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 853, fn. 19.)

That being said "foreseeability alone is not sufficient to create an independent tort duty. ' "Whether a defendant owes a duty of care is a question of law. Its existence depends upon the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability." [Citation.]' (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1072 [9 Cal.Rptr.2d 615, 831 P.2d 1197].) Because the consequences of a negligent act must be limited to avoid an intolerable burden on society [citation], the determination of duty 'recognizes that policy considerations may dictate a cause of action should not be sanctioned no matter how foreseeable the risk.' ([*Elden v. Sheldon* (1988) 46 Cal.3d 267, 274 [250 Cal.Rptr. 254, 758 P.2d 582]], fn. omitted.) '[T]here are clear judicial days on which a court can foresee forever and thus determine liability but none on which the foresight alone provides a socially and judicially acceptable limit on recovery of damages for [an] injury.' (*Thing v. La Chusa* (1989) 48 Cal.3d 644, 668 [257 Cal.Rptr. 865, 771 P.2d 814].) In short, foreseeability is not synonymous with duty; nor is it a substitute." (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 552 [87 Cal.Rptr.2d 886, 981 P.2d 978].)

Appellants contend that AMF's conduct in promoting and producing the "all night drug infested rave to teenagers" satisfies the foreseeability requirement because the party was "sufficiently likely to result in auto accidents" which would injure both rave attendees and members of the general public. We agree with appellants that "the low threshold for foreseeability is met here." (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 269 [80 Cal.Rptr.2d 196] (*Adams*).) Virtually any consequence of an all-night party attended largely by teenagers was foreseeable. It was foreseeable that attendees would attempt to sneak drugs into the facility. It was foreseeable that attendees might purchase and use drugs. It was foreseeable that the partygoers would attempt to drive home, either while impaired from drug use and/or from fatigue, if they stayed at the party all night long.

However, as established by legal authority and demonstrated by the facts in the instant case, "almost any result was foreseeable with the benefit of hindsight." (*Adams, supra*, 68 Cal.App.4th at p. 269.) For that reason, foreseeability is not coterminous with duty. (*Juarez, supra*, 81 Cal.App.4th at p. 404.) " 'A court may find that no duty exists, despite foreseeability of harm, because of other factors and considerations of public policy.' " (*Id.* at p. 405.) We must therefore turn to the remaining *Rowland* factors to determine whether a duty of care exists not to host a rave party.

Before we discuss the other *Rowland* factors, however, we must dispose of appellants' heavy reliance upon *Weirum, supra*, 15 Cal.3d 40, in support of their contention that satisfaction of the foreseeability element herein equates with a duty of care. In *Weirum*, a radio station held a contest broadcast in

which teenage drivers were encouraged to search for and find a popular radio disc jockey who was traveling to various locations around Los Angeles in a conspicuous red automobile. Periodically, he would advise the radio station of his whereabouts, and the station would broadcast that information to the listeners. The first person to physically locate the disc jockey and fulfill a particular condition would win a cash prize.

Upon learning that the disc jockey was nearby, two teenage drivers were racing to follow him and win a prize. In attempting to follow the disc jockey's vehicle, one of the two drivers forced a third party's car onto the center divider of the freeway, where it overturned. The driver was killed, and his family brought an action for wrongful death against the radio station.

The California Supreme Court considered "whether defendant owed a duty to decedent arising out of its broadcast of the giveaway contest" (*Weirum*, *supra*, 15 Cal.3d at pp. 45–46), and concluded that it did. "It was foreseeable that defendant's youthful listeners, finding the prize had eluded them at one location, would race to arrive first at the next site and in their haste would disregard the demands of highway safety." (*Id.* at p. 47.) Moreover, the court's opinion rested largely upon the facts presented in that case. "The giveaway contest was no commonplace invitation to an attraction available on a limited basis. It was a competitive scramble in which the thrill of the chase to be the one and only victor was intensified by the live broadcasts which accompanied the pursuit .... In [other] situations there is no attempt, as here, to generate a competitive pursuit on public streets, accelerated by repeated importuning by radio to be the very first to arrive at a particular destination. Manifestly the [contest] bears little resemblance to daily commercial activities." (*Id.* at p. 48.)

The all-night rave party is decidedly distinguishable from the contest at issue in *Weirum*. Unlike the radio contest, in which hazardous driving by teenagers was a necessary component of the game, the rave party was simply a party attended by teenagers. While drugs may have been anticipated, the teenagers did not need to use drugs to attend the party. AMF did not promote drug use; in fact, it took numerous steps to discourage and prevent drug use. And, although the party lasted all night, the attendees were not required to stay until they were too tired to drive home.

These distinctions between the instant case and *Weirum* are critical. While the radio station in *Weirum* had ongoing direct involvement in the act that caused the accident and injuries, AMF had no such direct link to the unfortunate accident in this case. Under these circumstances, applying the facts and holding of *Weirum* to this case would not only unduly broaden the scope of the legal duty of care, but it would also contradict the rationale of

the social host liability cases discussed in section I.B.5, *post*, a leap in legal analysis we decline to take.

Moreover, unlike the unique contest in *Weirum*, the all-night party at issue herein resembles many commonplace commercial activities. Countless bars and restaurants, for example, are open late and provide patrons with the opportunity to drink alcohol, become intoxicated, and then drive. Rock concerts are advertised to and attended by teenagers who thereafter drive home, sometimes under the influence of alcohol and/or drugs. Annual New Year's Eve parties routinely are celebrated until early morning hours, with partygoers driving home either impaired or extremely fatigued. All-night parties, complete with a variety of alcoholic beverages, are an inescapable aspect of college life. Courts have refused to hold business owners and hosts in these situations liable for negligence. (*Knighten v. Sam's Parking Valet* (1988) 206 Cal.App.3d 69, 73–74 [253 Cal.Rptr. 365] (*Knighten*); *Baldwin v. Zoradi* (1981) 123 Cal.App.3d 275, 288, 291 [176 Cal.Rptr. 809] (*Baldwin*); *Coulter v. Superior Court* (1978) 21 Cal.3d 144, 155 [145 Cal.Rptr. 534, 577 P.2d 669] (*Coulter*).) We see no reason to depart from the analysis in these cases.

### 2. Degree of Certainty that Appellants Suffered Injury and Closeness of the Causal Connection

Although appellants undeniably were injured, their injuries were not closely connected to AMF's conduct in renting its facility for a rave party. As set forth above, hosting a rave party does not equate with an unreasonable risk of harm. While the sale and consumption of drugs may have occurred at the party, there is no evidence that AMF encouraged or participated in drug use[4] or required the attendees to stay at the party. In fact, the evidence demonstrates just the opposite—AMF took numerous steps to prevent drug use at its facility. Contrariwise, there is a close connection between Chen's decision to drive, the others' decision to go in her car, and the regrettable accident. (See, e.g., *Andre v. Ingram* (1985) 164 Cal.App.3d 206, 211 [210 Cal.Rptr. 150] ["consumption, not furnishing, alcoholic beverages is the proximate cause of resulting injuries"]; *Baldwin, supra*, 123 Cal.App.3d at pp. 286–287 [finding a lack of a close connection between the failure of the university to control on-campus drinking and a speed contest between allegedly intoxicated students].) Under these circumstances, we are left with

---

[4] As discussed in unpublished section II.B.1, *post*, the declaration of Reginald Gibson filed in support of appellants' motion for reconsideration does not offer any competent evidence that AMF employees sold drugs to the rave party attendees.

only one reasonable conclusion: appellants' injuries were not closely connected to the rave party.[5] (Cf. *Martinez v. Pacific Bell* (1990) 225 Cal.App.3d 1557, 1565–1566 [275 Cal.Rptr. 878] (*Martinez*).)

### 3. *Moral Blame*

"Moral blame has been applied to describe a defendant's culpability in terms of the defendant's state of mind and the inherently harmful nature of the defendant's acts.... [C]ourts have required a higher degree of moral culpability such as where the defendant (1) intended or planned the harmful result [citation]; (2) had actual or constructive knowledge of the harmful consequences of their behavior [citation]; (3) acted in bad faith or with a reckless indifference to the results of their conduct [citations]; or (4) engaged in inherently harmful acts [citation]." (*Adams, supra*, 68 Cal.App.4th at p. 270.)

Here, there is nothing morally blameworthy about AMF's decision to rent its roller skating rink for a rave party, particularly under the facts presented in this case. There is no evidence that AMF intended or planned for teenagers to drive while impaired, had actual or constructive knowledge that the rave would result in the subject vehicle collision, or acted with bad faith or a reckless indifference to the consequences of allowing its roller skating rink to be used for a rave. To the contrary, not only did AMF not provide drugs to the attendees, it took numerous steps to prevent drug use at its facility, including searching the attendees, confiscating drugs and drug paraphernalia, and evicting any drug dealers.

### 4. *Policy of Preventing Future Harm, Extent of Burden to AMF, and Consequences to the Community*

Appellants additionally argue that imposing liability upon AMF will advance the policy of preventing future harm to both partygoers and the general public. Although we agree that preventing vehicle accidents which result from drug use and/or fatigue is an important goal, we question whether the public policy of preventing future harm will be furthered by the imposition of liability.

*Baldwin, supra*, 123 Cal.App.3d 275, is instructive. In that case, the Court of Appeal refused to hold a university liable for a student's injuries after she

---

[5] Similarly, one article suggests that federal efforts to prosecute and convict club owners who have hosted rave parties, but "who have not actively taken part in the alleged drug activity, is doomed to failure." (Note, *Targeting Ecstasy Use at Raves* (2002) 88 Va. L.Rev. 1583, 1622 (hereafter Note).) The necessary causal connection between hosting the rave party (without supplying drugs) and injuries suffered either by attendees or third parties after partygoers have left the rave is absent. For this reason, that author opines that while drug activity should be eliminated from raves, rave parties should continue without drugs. (*Ibid.*)

and others consumed alcohol on campus and then participated in a car speed contest. (*Id.* at pp. 279, 291.) The court examined the *Rowland* factors in order to determine whether the university owed the plaintiff a duty of care. (*Baldwin*, at p. 286.) "In reference to the policy of preventing future harm, we do not have here a case where university administrators collaborated with others to encourage students to imbibe with knowledge of their intention to thereupon operate a motor vehicle." (*Id.* at p. 290.) Quite simply, the policy of preventing future harm was not strong "because of the lack of direct involvement with the furnishing of alcoholic beverages." (*Ibid.*)

The same analysis rings true in the instant case. There is no evidence that AMF collaborated with anyone to encourage partygoers to use ecstasy or other intoxicants. Absent such evidence, and coupled with evidence that AMF engaged in numerous measures to prevent drug use on its premises, the policy of preventing future harm is not strong in the instant case.

As such, other than speculation, there is no evidence that the type of harm appellants seek to prevent will follow a ruling which outlaws rave parties. As appellants concede, teenagers are highly susceptible to peer pressure. If they feel pressure to experiment with drugs or stay out all night, they might yield to that pressure, regardless of whether rave parties exist. (See, e.g., 21 U.S.C. § 1521 [acknowledging that the sale and use of ecstasy and other drugs is not limited to rave parties]; Note, *supra*, 88 Va. L.Rev. at pp. 1622–1623 [commenting that "targeting all raves will not stop ecstasy use because the drug will continue to be used at concerts, in bars, and on college campuses"].)

Appellants insist that AMF had a duty to take steps in order to make the rave party a safe haven, including by shortening the time periods of the raves, providing transportation, offering resting accommodations to the attendees, and enacting "serious measures to curtail the use of drugs." Imposing such requirements upon AMF would be unduly burdensome.

First, it is virtually impossible for a party organizer to rid all drugs from its facility. Ecstasy is small, described in this case by Sakiyama as similar to "a white Advil pill." A party attendee easily could conceal such a small pill in order to bring it into the rave. And, AMF took more than reasonable steps to minimize the presence of drugs at the party, including by ejecting known drug dealers and requiring attendees to pass through two security check points.

Likewise, it would be impossible for a party host to accommodate "tired" party attendees. The expense of offering transportation and resting facilities would be enormous, not to mention raising additional safety concerns. Who

would drive the patrons from the party? Where would they go? Who would supervise the resting rooms? And, who would bear the costs and risks of such measures?

Moreover, the party attendees were free to leave the party at any time if they were tired. AMF had no duty to prevent them from driving whenever they chose to leave, even if they were too fatigued or impaired to do so safely. (*Knighten, supra,* 206 Cal.App.3d at pp. 73–74.) Such a rule makes sense. How could AMF employees assess whether an attendee was capable of driving?

The alternative proposed by appellants—to ban all raves—would be onerous to our community. Appellants seek to prohibit rave parties because they provide a venue for attendees to stay up all night, potentially use drugs, and then drive when they are either under the influence or too fatigued to do so. Unfortunately, there is no evidence that the rave scene will cease if we hold business owners liable to persons injured after they leave a rave party. Rather, it is just as likely that rave parties in traditional commercial settings (such as AMF's roller skating rink) will be replaced by raves in far more dangerous places, such as abandoned warehouses. (Note, *supra,* 88 Va. L.Rev. at p. 1604.)

Furthermore, if we were to accept appellants' premise, then banning raves is not the only answer; rather, appellants are asking us to prohibit or impose liability upon other businesses or noncommercial events which also involve late night activities and possible drug and/or alcohol use. As set forth above, many business, including bars, casinos, movie theaters, restaurants, and sporting events would suffer drastic economic losses were we to adopt appellants' argument. Accordingly, we decline to do so.

### 5. *Social Host Liability*

 Our conclusion is consistent with social host liability decisions which have held that defendants who simply provide venues for drinking alcohol do not owe a duty of care to plaintiffs injured by guests who drive from the facilities while intoxicated. For example, in *Coulter, supra,* 21 Cal.3d at pages 152–153, our Supreme Court held "that the service of alcoholic beverages to an obviously intoxicated person by one who knows that such intoxicated person intends to drive a motor vehicle creates a *reasonably foreseeable* risk of injury to those on the highway."[6] The court's

---

[6] Business and Professions Code "[s]ection 25602, subdivision (c), and Civil Code section 1714, subdivision (b), expressly abrogate this part of *Coulter* in favor of prior judicial interpretation finding the consumption rather than the serving of alcoholic beverages as the proximate cause of injuries inflicted upon another by an intoxicated person." (*Leong v. San*

holding hinged upon the allegation that the defendants actually supplied thealcohol to the driver. To the extent the plaintiff only alleged that other defendants allowed drinking on their premises and/or "in some unspecified manner, 'aided, abetted, participated and encouraged' [the driver] to drink to excess," the plaintiff's claim failed. (*Id.* at p. 155.) "Since neither of these allegations asserted that defendants or their agents actually furnished liquor to [the driver], no liability is imposed under the principles hereinabove set forth. [Citations.]" (*Ibid.*)

Following *Coulter*, the Court of Appeal in *Leong*, *supra*, 235 Cal.App.3d at pages 829–830, affirmed the dismissal of a wrongful death complaint. The plaintiffs' son was killed by a drunk driver who had attended and became intoxicated at a San Francisco Giants baseball game. The plaintiffs brought a negligence claim against SF Parking, Inc., and the Giants, alleging that the defendants were liable because they knew or should have known that patrons would consume alcohol on their premises and, despite having this knowledge, failed to take reasonable steps to prevent or prohibit such conduct. (*Id.* at p. 830.) The trial court sustained the defendants' demurrer, and the Court of Appeal affirmed, reasoning that the plaintiffs' claim that the defendants "failed to prevent or to prohibit patrons from drinking and actually encouraging the use of the parking lot premises for drinking" could not proceed because the plaintiffs neglected to allege that the defendants actually furnished the patrons with alcohol. (*Id.* at p. 832.) The defendants could not be held liable, as a matter of law, "for simply permitting [patrons] to consume alcoholic beverages on [their] premises." (*Ibid.*)

Other state courts have reached similar conclusions in the context of rave parties. For example, in *Looby v. Local 13 Productions* (Pa. 2000) 751 A.2d 220, the plaintiffs attended a rave party. They drove to the party with Katrina Coluzzi, who apparently consumed alcohol and/or drugs while at the party. Coluzzi then attempted to drive the plaintiffs home, but lost control of her vehicle. The plaintiffs were injured, and they filed suit against various persons "for allegedly encouraging the use of illegal drugs" at the rave party. The court affirmed the dismissal of their complaint because there was no evidence or allegation that the defendants provided the intoxicants to Coluzzi. (*Id.* at p. 222.)

Similarly, in the instant case, appellants direct us to no evidence that AMF furnished drugs to the party attendees.[7] Thus, appellants are left with the sole claim that AMF had a duty not to host a rave party because it was foreseeable that drugs would be used, that Chen would ingest drugs, and that she would

---

*Francisco Parking, Inc.* (1991) 235 Cal.App.3d 827, 832–833, fn. 7 [1 Cal.Rptr.2d 41] (*Leong*).)

[7] See footnote 4, *ante.*

thereafter drive either under the influence of ecstasy or while extremely fatigued. Although we agree that these activities were foreseeable, we cannot find, as a matter of law, that they equate with a duty of care. After all, AMF could not have prevented the rave attendees from leaving the premises and driving whenever they chose to do so, just as the patrons did in *Leong, supra,* 235 Cal.App.3d 827. And once they did leave the party, an act which AMF could not prevent, AMF had no control over their conduct. Under these circumstances, we cannot find that AMF owed appellants a duty of care. (*Martinez, supra,* 225 Cal.App.3d at pp. 1563–1564.)

 Our holding also comports with the rule that business owners do not have a duty to prevent persons either under the influence of alcohol or otherwise incompetent to drive from driving while impaired. (*Knighten, supra,* 206 Cal.App.3d at pp. 73–74; see also *Nipper v. California Auto. Assigned Risk Plan* (1977) 19 Cal.3d 35, 46–47 [136 Cal.Rptr. 854, 560 P.2d 743] [holding that an automobile insurer is not obligated to take affirmative steps to assure that incompetent drivers are denied liability insurance, thereby inhibiting their desire to drive].) We accept and apply this principle to the instant case. Unfortunately, drug use among teenagers has become all too prevalent in our society. (21 U.S.C. § 1521.) Holding the host of a party liable for injuries suffered by teenagers who foolishly choose to use drugs and then drive would effectively amount to making such defendants "insurers of public safety, contrary to well-established policy in this state." (*Ann M., supra,* 6 Cal.4th at p. 679; see also *Sharon P., supra,* 21 Cal.4th at p. 1190.)

C., D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *Motion for Reconsideration**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## CONCLUSION

We are sympathetic to the injured teenagers and the families of the deceased, and our opinion should not be construed as condoning what transpired on March 13–14, 1999. Nevertheless, we do not believe that we can or should ban rave parties, or allow providers of venues for such parties to face liability for the innumerable consequences which can follow a late night party often entailing drugs and/or alcohol. Rather, we reserve this issue

---

*See footnote, *ante,* page 398.

for the Legislature, to the extent it finds that restrictions and/or regulations are necessary to remedy the perceived risks of rave parties. (See, e.g., Assembly Bill No. 1941 (2001–2002 Reg. Sess.) as amended May 15, 2002; Ill. House Bill No. 5952 (2001–2002 Gen. Assem.) as introduced Feb. 11, 2002.)

The judgment and orders of the trial court are affirmed. AMF is entitled to its costs on appeal.

Boren, P. J., and Doi Todd, J., concurred.

A petition for a rehearing was denied August 6, 2003, and the petition of appellants Shion Sakiyama et al., for review by the Supreme Court was denied September 24, 2003.