[No. C045727. Third Dist. Jan. 10, 2008.]

DANIEL LAWRENCE McGARRY, Plaintiff and Appellant, v.
SCOTT W. SAX et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part B. of the Discussion.

## COUNSEL

Daniel Lawrence McGarry, in pro. per.; and Linda Foster for Plaintiff and Appellant.

Pagliero & Associates and Candace M. Pagliero for Defendants and Respondents.

## OPINION

RAYE, J.—Following an exhilarating performance by professional skateboarders, one of the performers flung a skateboard deck (a skateboard without wheels and hardware) into a horde of eager spectators, all vying for the prize. The spectators, plaintiff Daniel Lawrence McGarry among them, toppled to the ground with the skateboard in their midst. During the melee, McGarry suffered injuries that eventually led to the removal of his clavicle bone joint.

McGarry filed a complaint for personal injury against Scott W. and Diane Sax, owners of Wave Skate and Surfwear (The Wave), a skateboard store on the premises where the performance took place. McGarry later identified Tum Yeto, Inc. (Tum Yeto), a skateboard manufacturer, as Doe X in the original

complaint. McGarry subsequently filed an amended complaint, again alleging personal injuries against The Wave, but did not name Tum Yeto as a defendant.

McGarry appeals from an adverse summary judgment, contending the court erred in dismissing Tum Yeto, a triable issue of fact exists as to The Wave's duty to McGarry, the skateboarder who threw the skateboard acted as an agent of The Wave, the court's finding of independent contractor status does not preclude liability, and assumption of risk does not apply to a skateboard toss. In the unpublished portion of this opinion, we conclude that the judgment as to Tum Yeto is not a subject of the present appeal. The judgment in favor of The Wave is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 28, 1996, McGarry, aged 22, attended a skateboard exhibition in the parking lot in front of The Wave's leased place of business. The parking lot was not part of the premises leased by The Wave but was used with the permission of the property management company. A group of professional skateboarders, who traveled the country giving skateboarding exhibitions, put on the exhibition before a large crowd of spectators. The professional skateboarders also participated in tournaments, where they competed as individual contestants sponsored by various companies.

Toward the end of the exhibition, one of the skateboarders announced the product toss—that they were "going to throw some stuff out"—and invited those who wanted to compete to move to a designated area. McGarry denies hearing the announcement of the product toss and that there was a designated area but recalls that he saw "some Tum Yeto skateboarder guys" throwing shirts and stickers into the crowd. He moved to that area. McGarry caught a shirt with a Tum Yeto insignia on the front. According to McGarry, "[e]very-thing seemed very tame."

When McGarry saw the skateboarder wave a skateboard deck at the crowd, he raised his hands and said, "right here." The skateboarder appeared to notice McGarry because of his height. McGarry estimated he stood among 50 to 100 other spectators vying for the skateboard. As the skateboard fell into the crowd, McGarry, because of his height, was able to grab it and press it against his chest. Those around him began grabbing for the skateboard. McGarry held it tight against himself but then fell to the ground. As other

spectators attempted to wrest control of the skateboard, they stomped, trampled, pushed, and shoved McGarry, who ended up at the bottom of a pile of people. Eventually another spectator took possession of the skateboard. After the pile broke up, McGarry lay on the ground, in pain and severely dazed.

After the incident, McGarry did not contact The Wave about his injuries. He never entered defendants' store, nor did he speak with anyone connected with The Wave.

This description of the events leading to McGarry's injuries is largely undisputed. There are disagreements over other facts pertaining to the parties' knowledge of prior product tosses, the control of the product toss, and the nature of the relationship between Tum Yeto, The Wave, and the skateboarders, though many of these facts are undisputed as well.

McGarry submitted a declaration in which he stated he had seen only one skateboard toss prior to the incident on April 28, 1996. At that toss, no one fell down or was injured. According to McGarry, "There was nothing that I saw there that would lead me to believe that I could become injured by being involved in a product toss."

Just as McGarry disclaims an appreciation of a risk of injury from participation in the product toss, so also do defendants deny knowledge of any injuries from prior product tosses. The Wave had sponsored similar events, including skateboard tosses, several times prior to the April 1996 incident. The Wave was unaware of any injuries during those prior events. Nor was any violence reported to The Wave during the prior tosses.

The president of Tum Yeto, Tod Swank, believed many such events take place each year. Swank knew of no instance in which a product toss disintegrated into a mob scene. Swank stated he understood contact with others while trying to obtain possession of the skateboard is a risk inherent in the nature of the product toss.

However, McGarry submitted a declaration by Jacob Garcia, who had witnessed about 30 product tosses after skateboarding exhibitions. Garcia stated: "I have witnessed numerous people get injured when items are tossed into the crowd, especially when a skateboard is tossed into the crowd." Garcia stated he became injured during a toss when he caught a skateboard. Garcia attended the April 28, 1996, toss and saw McGarry catch the skateboard and end up at the bottom of a pileup.

Responsibility for the product toss is disputed. The Wave and Tum Yeto argue the product toss was under the control of the skateboarders, who were

independent contractors. There is evidence that Tum Yeto supplied skateboard merchandise to The Wave for sale. Tum Yeto's representative approached The Wave about holding a skateboard demonstration outside its store. Tum Yeto and The Wave agreed to cosponsor the event. Tum Yeto arranged for the skateboarders who participated. Tum Yeto chose the date of the exhibition and provided merchandise for the skateboarders to distribute.

The Wave purchased advertising time on radio station KWOD 106.5 and provided the ramps used by the skateboarders. The Wave employees also supervised crowd control at the exhibition to ensure the general safety of onlookers. The employees did not, however, attempt crowd control in the area set aside for the skateboard toss.

McGarry offered evidence calculated to demonstrate the danger of product tosses and to establish the complicity of Tum Yeto and The Wave in sponsoring the product toss. The Wave and Tum Yeto objected to much of the evidence produced by McGarry. The trial court signed an order relating to the objections. However, the order does not reveal which of the objections were granted or denied. Defendants never requested clarification of the order.

McGarry offered a videotape produced by defendants of a skateboard product toss. Although McGarry initially stated the videotape depicts the toss at which he was injured, in his opening brief McGarry states he now believes it depicts a *second* skateboard toss that took place the same day. Elsewhere, McGarry describes the tape as depicting a typical skateboard product toss. McGarry also offered stills from the videotape.

However, McGarry made no effort to authenticate the videotape. His declaration fails to mention either the videotape or the stills.

The provenance of the tape remains shrouded in mystery. McGarry states The Wave produced the videotape during discovery but variously describes it as depicting the actual skateboard toss, a later skateboard toss, or a "typical" skateboard toss.

■ "Authentication of a writing is required before it may be received in evidence." (Evid. Code, § 1401, subd. (a).) A videotape is the equivalent of a writing under the Evidence Code and thus must comply with the requirements of Evidence Code sections 1400 and 1401. (*Jones v. City of Los Angeles* (1993) 20 Cal.App.4th 436, 440, fn. 5 [24 Cal.Rptr.2d 528].) Under Evidence Code section 1400, a video recording is authenticated by testimony or other evidence that it actually depicts what it purports to show. (*People v. Mayfield* (1997) 14 Cal.4th 668, 747 [60 Cal.Rptr.2d 1, 928 P.2d 485].) McGarry fails to provide any authentication of the videotape or the stills. This failure

rendered the proffered evidence inadmissible at trial. It also renders it useless on appeal because we do not know what the material actually depicts.

In addition, McGarry offers pages of what appear to be the result of Internet searches of various Web sites. The name Tum Yeto appears in various places. Again, McGarry fails to provide any authentication for these documents or explain their relevance in the summary judgment motion. In his reply brief, McGarry merely states the purpose of the Web site printouts is to show that Tum Yeto advertises its skateboarding tours to the general public, tours that "are likely" an integral part of Tum Yeto's business.

McGarry also submitted into evidence the handwritten text of an advertisement broadcast over KWOD 106.5. In part, the advertisement states: "Join me this Sunday from 2 til 5 p.m. as Toy Machine and Foundation pro skaters Jaime Thomas, Chad Muska, Ed Temples, Steve Berra and Paul Sharp join The Wave skateboard team for a demo in The Wave's parking lot." McGarry contends the advertisement shows the professional skateboarders were part of a team put together by The Wave. However, standing alone, the advertisement proves nothing.

*Procedural Background*

On February 7, 1997, McGarry filed a complaint for personal injuries against The Wave and Royce International Broadcasting Corporation, doing business as KWOD 106.5, which broadcast advertisements for the skateboard performance. On June 2, 1997, McGarry identified Tum Yeto as a Doe defendant in the complaint.

The Wave filed and served a motion for summary judgment on November 21, 1997. The trial court set a trial date of January 21, 1998, causing the hearing for the summary judgment motion to fall within 30 days of the trial date.

On December 19, 1997, McGarry filed a first amended complaint for personal injuries against The Wave, KWOD 106.5, and various Doe defendants. The amended complaint alleged defendants planned a promotional event that "included a 'product toss,' specifically that a skateboard would be given away by throwing it out into the crowd of youths attending the event." The complaint alleges defendants "pitched a skateboard into the crowd" and the skateboard "went directly for [McGarry]." A group of young men attending the event, "in their passion to obtain control of the skateboard, piled upon [McGarry]," who clutched the prize, stomping, trampling, and pushing him. As a result, McGarry suffered permanent, painful injuries to his ligaments, clavicle bone, and shoulder.

The amended complaint also alleges McGarry's injuries were foreseeable to defendants, since they had engaged in numerous product tosses and had knowledge of the manner in which youths react to a large prize being thrown into a crowd. The complaint states: "The Wave was very familiar with their customers, skateboarding crowd, and knew, or should have known, that pitching a skateboard into the crowd at the Promotional Event was a dangerous plan." The complaint also faults defendants for choosing a "spec[tac]ular" product toss giveaway method as opposed to a safer raffle, and for failing to provide adequate security personnel.

The first amended complaint did not name Tum Yeto, nor was it personally served on any authorized agent of Tum Yeto. Nor does the first amended complaint refer to Tum Yeto. McGarry dismissed KWOD 106.5 with prejudice on January 29, 1998.

The trial court granted summary judgment. McGarry appealed, arguing the motion was set for hearing fewer than 30 days before trial in violation of Code of Civil Procedure section 437c.[1] This court reversed the judgment, holding that while McGarry was mistaken in his belief that the trial court could not hear the motion, the mistake was a sincere and honest one.[2]

The Wave renoticed the summary judgment motion for hearing on August 26, 2003. Following several continuances, the trial court adopted its tentative ruling and granted The Wave's motion. The court denied as moot the motion for summary judgment filed by Tum Yeto, holding that Tum Yeto was not named as a defendant in the first amended complaint.

As to The Wave's motion, the court found a triable issue of material fact regarding the doctrine of assumption of risk, "as it is not clear what dangers plaintiff was aware of at the time of the incident." However, the court held McGarry failed to demonstrate a triable issue of material fact as to the element of duty.

The court acknowledged that a property owner must exercise ordinary care in the management of his or her premises in order to avoid exposing persons to an unreasonable risk of harm. However, McGarry failed to show The Wave owned the property where his injury occurred.

Even assuming The Wave owned the property, the court expressed the view that "whether or not there was a duty focuses on the issue of foreseeability: was it foreseeable that plaintiff would be injured by co-participants during a

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

[2] *McGarry v. Sax* (Dec. 5, 2002, C028997) (nonpub. opn.).

product toss?" The court held McGarry presented no evidence that such an injury was foreseeable. The court noted that McGarry's own declaration stated he never saw anyone injured at the demonstrations he had previously attended. In addition, The Wave's unopposed declarations established they had never known of such an injury occurring. The court concluded: "Plaintiff does not present any evidence that an injury ever occurred during a product toss at any demonstration sponsored by the Wave in order to establish that the Wave knew or should have known that such injury could occur."

Finally, the court found McGarry presented no evidence that The Wave had any right to control the manner and means of the demonstration or product toss conducted by the skateboarders. The court concluded no issue of material fact existed to show that the skateboarders were more than mere independent contractors.

On October 14, 2003, after the trial court announced its intent to adopt the tentative ruling on summary judgment, McGarry filed an amendment to the complaint, attempting to substitute Tum Yeto in place of defendant Doe X. McGarry also filed a motion to allow him the opportunity to rebut issues causing the court to dismiss Doe X, Tum Yeto.

The court denied McGarry's motion to allow him an opportunity to rebut issues and entered a judgment of dismissal in favor of Tum Yeto. The court, after hearing argument, also entered an amended order granting summary judgment in favor of The Wave. McGarry filed a timely notice of appeal.

## DISCUSSION

### A. *Standard of Review*

A defendant may move for summary judgment "if it is contended that the action has no merit . . . ." (§ 437c, subd. (a).) "A defendant . . . has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (§ 437c, subd. (p)(2).) "The motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (§ 437c, subd. (c).)

We must make our own independent determination regarding the construction and effect of the papers supporting and opposing the summary judgment.

"We apply the same three-step analysis required of the trial court. We begin by identifying the issues framed by the pleadings since it is these allegations to which the motion must respond. We then determine whether the moving party's showing has established facts which justify a judgment in movant's favor. When a summary judgment motion prima facie justifies a judgment, the final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue." (*Hernandez v. Modesto Portuguese Pentecost Assn.* (1995) 40 Cal.App.4th 1274, 1279 [48 Cal.Rptr.2d 229].) "Any doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion." (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].)

"On appeal, we review the trial court's decision to grant or deny the summary judgment motion de novo, on the basis of an examination of the evidence before the trial court and our independent determination of its effect as a matter of law. [Citations.] We are not bound by the trial court's stated reasons or rationale. Instead, we review the summary judgment without deference to the trial court's determination of questions of law." (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163 [80 Cal.Rptr.2d 66].)

B. *Tum Yeto's Dismissal**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

C. *Duty*

■ McGarry seeks to establish a cause of action for negligence. "The elements of negligence are: (1) defendant's obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks (duty); (2) failure to conform to that standard (breach of the duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages)." (*Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 279 [12 Cal.Rptr.3d 846] (*Vasquez*).) "The existence of a legal duty to use reasonable care in a particular factual situation is a question of law for the court to decide. (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 265 [80 Cal.Rptr.2d 196].) However, the elements of breach of that duty and causation are ordinarily questions of fact for the jury's determination. (*Andrews v. Wells* (1988) 204 Cal.App.3d 533, 538 [251 Cal.Rptr. 344].)" (*Vasquez*, at p. 278.)

■ The trial court concluded that McGarry had failed to establish the first element of negligence, duty. Under general negligence principles and Civil

---

*See footnote, *ante*, page 983.

Code section 1714, a person ordinarily is obligated to exercise due care in his or her own actions so as not to create an unreasonable risk of injury to others. This legal duty generally is owed to the class of persons who it is reasonably foreseeable may be injured as the result of the actor's conduct. Moreover, one's general duty of care includes the duty not to place another person in a situation in which the other person is exposed to an unreasonable risk of harm through the reasonably foreseeable conduct, including reasonably fore-seeable negligent conduct, of a third person. (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 716 [110 Cal.Rptr.2d 528, 28 P.3d 249].)

■ As a general rule, one owes no duty to control the conduct of another, or to warn those endangered by such conduct. Such a duty may arise, however, if a special relationship exists between the actor and the third person that imposes a duty upon the actor to control the third person's conduct, or a special relationship exists between the actor and another that gives the other a right to protection. (*Doe 1 v. City of Murrieta* (2002) 102 Cal.App.4th 899, 918 [126 Cal.Rptr.2d 213] (*Murrieta*).)

Defendants note that McGarry was not injured by the skateboard tossed into the crowd but by the acts of other spectators. Because the injuries were inflicted by third persons, defendants seek to invoke the special relationship doctrine. They argue that in the absence of a special relationship, defendants had no duty to either control the conduct of the spectators or protect McGarry from such conduct.

■ The special relationship doctrine is most commonly invoked "in cases involving the relationship between business proprietors such as shopping centers, restaurants, and bars, and their tenants, patrons, or invitees." (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235 [30 Cal.Rptr.3d 145, 113 P.3d 1159] (*Delgado*).) A business owner may have an affirmative duty to "control the wrongful acts of third persons which threaten invitees where the [owner] has reasonable cause to anticipate such acts and the probability of injury resulting therefrom." (*Taylor v. Centennial Bowl, Inc.* (1966) 65 Cal.2d 114, 121 [52 Cal.Rptr. 561, 416 P.2d 793].) The extent of the duty has been explored in numerous cases involving criminal acts against customers of bars and tenants of apartments, including acts perpetrated by fellow patrons and tenants. (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 674 [25 Cal.Rptr.2d 137, 863 P.2d 207]; see also *Kentucky Fried Chicken of Cal., Inc. v. Superior Court* (1997) 14 Cal.4th 814, 819 & 823–824 [59 Cal.Rptr.2d 756, 927 P.2d 1260]; *Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 806 [205 Cal.Rptr. 842, 685 P.2d 1193].) The doctrine also extends to other types of special relationships, including those between common carriers and passengers, and mental health professionals and their patients. (*Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334] (*Tarasoff*).)

McGarry's complaint contains no allegations of a special relationship creating a duty on the part of The Wave or the other defendants to control the conduct of the crowd. Indeed, he disavows any claim of premises liability and insists that the special relationship doctrine does not apply. Though unclearly stated, his claim is not that defendants were under a duty to control the crowd and thereby prevent the crowd from inflicting injury.[6] Rather, his claim quite simply is that defendants, like everyone, were under a duty to refrain from conduct creating an unreasonable risk of harm to others. The act of throwing a skateboard, or any other object of desire, into a crowd of skateboarders breached that duty. While alleging in the original complaint that he was "kick[ed] and slugg[ed]," his amended complaint asserts only that he was "inadvertently" injured. The injuries were not inflicted by third party criminals but resulted from the foreseeable exuberance of youth competing for a prize.

Underlying McGarry's argument is the notion that the special relationship doctrine applies to claims of nonfeasance, a failure to protect from the harmful acts of others.[7] McGarry's claim is one of misfeasance, that defendants *collectively* performed an affirmative act that created an unreasonable risk of harm. The risk came not from the skateboard itself but from the foreseeable conduct of third persons in attempting to gain possession of the board. As explained by McGarry, "The essence of [McGarry's] case is that throwing a skateboard into a crowd of youths is a dangerous way to promote a product, with no social good, and [defendants] could have reasonably foreseen that this method of advertising a product was likely to cause injury." We agree with McGarry. If the allegations of McGarry's complaint are correct, defendants were not passive onlookers as the events unfolded leading to McGarry's injuries. Rather, their affirmative acts set in motion the chain of events leading to the injuries in question.

■ In any event, " 'the use of special relationships to create duties has been largely eclipsed by the more modern use of balancing policy factors enumerated in *Rowland* [*v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561]].' " (*Murrieta, supra,* 102 Cal.App.4th at p. 918.) The factors considered relevant in *Rowland* are the following: "[(1)] the foreseeability of harm to the plaintiff, [(2)] the degree of certainty that the plaintiff suffered injury, [(3)] the closeness of the connection between the defendant's conduct and the injury suffered, [(4)] the moral blame attached to the defendant's conduct, [(5)] the policy of preventing future harm, [(6)] the extent of the

---

[6] Nor, for that matter, does he appear to claim that defendants' efforts at crowd control were inadequate or that their security did not act reasonably.

[7] As noted in *Tarasoff, supra,* 17 Cal.3d at page 435, footnote 5, "[t]his rule [that one person owes no duty to control the conduct of another] derives from the common law's distinction between misfeasance and nonfeasance, and its reluctance to impose liability for the latter."

burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and [(7)] the availability, cost, and prevalence of insurance for the risk involved." (*Rowland v. Christian, supra,* 69 Cal.2d at p. 113.)

### 1. *Foreseeability of Harm*

As McGarry correctly discerns, foreseeability is a critical factor in determining the existence of a duty. The trial court rested its duty finding on a lack of foreseeability. Disagreeing with the trial court, McGarry references the unauthenticated videotape and Scott Sax's comments regarding the event. Sax, one of The Wave's owners, stated the product toss was uneventful. Therefore, McGarry argues, The Wave admitted the product toss depicted in the videotape is "typical" of such events and The Wave is fully aware of the dire consequences of a product toss. McGarry also notes that Garcia, in his declaration, stated he witnessed many mishaps at other product tosses. Finally, McGarry points out that the president of Tum Yeto, Tod Swank, testified there are "risks inherent in the nature of the product toss."

Defendants' reply to McGarry's arguments on foreseeability reflects their view that McGarry must establish liability under the special relationship doctrine. According to defendants, McGarry was obliged to present proof of a high degree of foreseeability of prior similar incidents of violent acts. It is true that "heightened" foreseeability of third party criminal misconduct has been required under the special relationship doctrine before a landlord is duty bound to take expensive security precautions. (*Delgado, supra,* 36 Cal.4th at p. 238.) As we have already noted, however, defendants' reliance on the special relationship doctrine is misplaced. For that reason, their related arguments on foreseeability miss the mark as well.

■ McGarry was not obligated to prove similar instances of injury during a product toss conducted by defendants. It is the general character of the event that is required to be foreseeable. (*Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57–58 [192 Cal.Rptr. 857, 665 P.2d 947].) " '[F]oreseeability is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct.' [Citation.] One may be held accountable for creating even ' "the risk of a slight possibility of injury if a reasonably prudent [person] would not do so." ' [Citations.]" (*Id.* at p. 57.)

■ Still, "[t]o support a duty of care, the foreseeability must be reasonable. (*Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 402 [ . . . 97 Cal.Rptr.2d 12] (*Juarez*); *Sturgeon v. Curnutt* (1994) 29 Cal.App.4th

301, 306 [34 Cal.Rptr.2d 498].) The Court of Appeal has articulated the standard as follows: 'The reasonableness standard is a test which determines if, in the opinion of a court, the degree of foreseeability is high enough to charge the defendant with the duty to act on it. If injury to another " 'is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct' " [citations], we must label the injury "reasonably foreseeable" and go on to balance the other *Rowland* considerations.' (*Sturgeon, supra,* at p. 307.)" (*Sakiyama v. AMF Bowling Centers, Inc.* (2003) 110 Cal.App.4th 398, 406 [1 Cal.Rptr.3d 762].)

Foreseeability for purposes of duty cannot be divorced from the facts underlying an injury. Nonetheless, it is a question of law. While defendants quibble with the evidentiary showing McGarry made as to prior instances of injuries at product tosses, they make no effort to persuade us that McGarry's injuries were unforeseeable. Indeed, in asserting the defense of primary assumption of risk, they assume that McGarry and the other participants should have foreseen the possibility of injury. Their assumption is reasonable. Omniscience is not required to envision what will happen when a valuable object, prized by young, athletic males, is tossed among them. What makes this form of prize dispersal appealing is the very conduct by the participants that makes it hazardous. The inevitable melee, invoking images of hungry animals at feeding time, provides entertainment for spectators and participants alike. However, the risk of injury is apparent. The fact that injuries did not occur on previous occasions is less a commentary on the foreseeability of harm than on the fortuitousness of life.

As previously discussed, the fact that the harm was inflicted by third parties acting badly does not insulate defendants from liability. "If the likelihood that a third person may react in a particular manner is a hazard which makes the actor negligent, such reaction whether innocent or negligent does not prevent the actor from being liable for the harm caused thereby." (*Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 47 [123 Cal.Rptr. 468, 539 P.2d 36].) The reaction of the crowd in this instance was reasonably foreseeable. Generally, where the risk of injury is foreseeable, a person is under a duty to use care in his or her own actions so as not to create an unreasonable risk of injury to others.

### 2. *Primary Assumption of Risk*

■ However, "[t]he doctrine of primary assumption of the risk as defined by the court in *Knight v. Jewett* [(1992)] 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696], acts as a limitation to this general rule, recognizing that in certain situations the nature of the activity at issue is such that the defendant does not owe a legal duty to the plaintiff to act with due care." (*Bushnell v.*

*Japanese-American Religious & Cultural Center* (1996) 43 Cal.App.4th 525, 529 [50 Cal.Rptr.2d 671] (*Bushnell*).)

 The doctrine of primary assumption of risk is most frequently applied to sporting activities where "conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself." (*Knight v. Jewett, supra,* 3 Cal.4th at p. 315 (*Knight*).) "Courts should not 'hold a sports participant liable to a coparticipant for ordinary careless conduct committed during the sport' because 'in the heat of an active sporting event . . . , a participant's normal energetic conduct often includes accidentally careless behavior. . . . [V]igorous participation in such sporting events likely would be chilled if legal liability were to be imposed on a participant on the basis of his or her ordinary careless conduct.' " (*Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1068 [68 Cal.Rptr.2d 859, 946 P.2d 817] (*Cheong*), quoting *Knight, supra,* 3 Cal.4th at p. 318.)

 For these reasons, the general test is " 'that a participant in an active sport breaches a legal duty of care to other participants—i.e., engages in conduct that properly may subject him or her to financial liability—only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport.' " (*Cheong, supra,* 16 Cal.4th at p. 1068, quoting *Knight, supra,* 3 Cal.4th at p. 320.)

 However, the doctrine is not limited to sports, as the Supreme Court recognized in *Knight*: Whether a duty exists "does not turn on the reasonableness or unreasonableness of the plaintiff's conduct, but rather on [(1)] the nature of the activity or sport in which the defendant is engaged and [(2)] the relationship of the defendant and the plaintiff to that activity or sport." (*Knight, supra,* 3 Cal.4th at p. 309.) It is the "nature of the activity" and the parties' relationship to it that determines whether the doctrine applies—not its characterization as a sporting event.

Though most cases in which the doctrine of primary assumption of risk exists involve recreational sports (see, e.g., *Ford v. Gouin* (1992) 3 Cal.4th 339 [11 Cal.Rptr.2d 30, 834 P.2d 724] [water skiing]; *Knight, supra,* 3 Cal.4th 296 [touch football]; *Connelly v. Mammoth Mountain Ski Area* (1995) 39 Cal.App.4th 8 [45 Cal.Rptr.2d 855] [snow skiing]; and *Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248 [38 Cal.Rptr.2d 65] [white water rafting]), the doctrine has been applied to dangerous activities in other contexts (see, e.g., *Saville v. Sierra College* (2005) 133 Cal.App.4th 857 [36

Cal.Rptr.3d 515] [training in peace officer takedown maneuvers]; *Hamilton v. Martinelli & Associates* (2003) 110 Cal.App.4th 1012 [2 Cal.Rptr.3d 168] [training on physical restraint methods]; *Aaris v. Las Virgenes Unified School Dist.* (1998) 64 Cal.App.4th 1112 [75 Cal.Rptr.2d 801] [practice of cheerleader routines]; *Bushnell, supra*, 43 Cal.App.4th 525 [practice of moves in judo class]; and *Herrle v. Estate of Marshall* (1996) 45 Cal.App.4th 1761 [53 Cal.Rptr.2d 713] [injury to nurse's aide by nursing home patient]).

The activity here in question has aspects of a competitive sporting event. A product is tossed into a crowd of young people who have chosen to try and retrieve it in competition with others. While McGarry disputes that a separate area was set aside for the product toss, there is no dispute that he was a willing participant in the competition. McGarry disclaims an appreciation of the risk, asserting his observation of previous tosses revealed only "tame" activity. However, the risk is self-evident.[8] The products were not distributed to customers who waited politely in line for their turn; a limited supply of products was thrown into a throng of competitors. The more precious the prize, the more intense the rivalry and the greater the struggle. As he recognized in his entreaty of the product distributors to toss the skateboard to him, his size placed him at an advantage. Part of the thrill of a product toss of this nature is the unpredictability of where the product might land and the uncertainty of who might be successful in wresting control of it. That a competitor might fall and others land around and on him in an effort to secure the prize is an inherent risk of the competition.

We therefore agree with the trial court that defendants did not owe McGarry a duty of care, though we reach this conclusion despite our disagreement with much of the trial court's analysis. The determination of duty in this case does not hinge on foreseeability but rests on a consideration of the nature of the activity and the relationship of the parties to that activity. While the trial court found a triable issue of fact on the issue of assumption of risk, reasoning that it was not clear what dangers McGarry was aware of at the time of the incident, subjective appreciation of the risk is not a requirement for application of the primary assumption of risk doctrine. We are not bound by the trial court's rationale.

■■ We conclude that the doctrine of primary assumption of the risk bars McGarry's claim. In light of our conclusion that defendants owed no duty to McGarry, the remaining issues of the appeal are rendered moot.

---

[8] In any event, "Primary assumption of the risk is an objective test. It does not depend on a particular plaintiff's subjective knowledge or appreciation of the potential for risk." (*Saville v. Sierra College* (2005) 133 Cal.App.4th 857, 866 [36 Cal.Rptr.3d 515].)

## DISPOSITION

The judgment in favor of The Wave is affirmed. The Tum Yeto judgment is not a subject of the present appeal. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.276(a)(4).)

Scotland, P. J., and Sims, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 9, 2008, S160946.